## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

**GEOTAG INC.,**

    **Plaintiff,**

**v.**

| | |
|---|---|
| **FRONTIER COMMUNICATIONS CORP.**, *et al.*, | **2:10-cv-00265** |
| **YELLOWPAGES.COM, LLC,** *et al.*, | **2:10-cv-00272** |
| **GEORGIO ARMANI S.P.A.;** *et al.*, | **2:10-cv-00569** |
| **AROMATIQUE, INC.;** *et al.*, | **2:10-cv-00570** |
| **GUCCI AMERICA, INC.;** *et al.*, | **2:10-cv-00571** |
| **STARBUCKS CORP.;** *et al.*, | **2:10-cv-00572** |
| **RENT A CENTER, INC.;** *et al.*, | **2:10-cv-00573** |
| **THE WESTERN UNION COMPANY;** *et al.*, | **2:10-cv-00574** |
| **ROYAL PURPLE, INC.;** *et al.*, | **2:10-cv-00575** |
| **YAKIRA, L.L.C.;** *et al.*, | **2:10-cv-00587** |
| **WHERE 2 GET IT, INC.;** *et al.*, | **2:11-cv-00175** |
| **ZOOSK, INC.** | **2:11-cv-00403** |
| **EYE CARE CENTERS OF AMERICA, INC.** | **2:11-cv-00404** |
| **AMERCO,** *et al.* | **2:11-cv-00421** |
| **7-ELEVEN, INC.,** *et al.*, | **2:11-cv-00424** |
| **SUNBELT RENTALS, INC.** | **2:11-cv-00425** |
| **CLASSIFIED VENTURES, LLC.** | **2:11-cv-00426** |
| **CANON INC. and,** <br> **CANON U.S.A., INC.,** | **2:12-cv-00043** |
| **AMERICAN APPAREL INC.,** | **2:12-cv-00436** |
| **ABERCROMBIE & FITCH CO.,** | **2:12-cv-00437** |
| **AMERICAN EAGLE OUTFITTERS INC.,** | **2:12-cv-00438** |
| **ANN INC.,** | **2:12-cv-00439** |
| **BURLEIGH POINT LTD.,** | **2:12-cv-00441** |
| **CATALOGUE VENTURES, INC.,** | **2:12-cv-00442** |
| **BURBERRY LIMITED,** | **2:12-cv-00443** |
| **BURLINGTON FACTORY WAREHOUSE** <br> **CORPORATION,** | **2:12-cv-00444** |
| **CACHE INC.,** | **2:12-cv-00445** |
| **THE WILLIAM CARTER COMPANY,** | **2:12-cv-00446** |

| | |
|---|---|
| **CHARMING SHOPPES INC.,** | **2:12-cv-00447** |
| **CHICO'S FAS INC.,** | **2:12-cv-00448** |
| **CITI TRENDS INC.,** | **2:12-cv-00449** |
| **CLAIRE'S BOUTIQUES, INC.,** | **2:12-cv-00450** |
| **COLDWATER CREEK INC.,** | **2:12-cv-00451** |
| **DAVID'S BRIDAL INC.,** | **2:12-cv-00452** |
| **DEB SHOPS INC.,** | **2:12-cv-00453** |
| **DELIAS INC.,** | **2:12-cv-00454** |
| **DESTINATION MATERNITY CORPORATION,** | **2:12-cv-00455** |
| **DIESEL U.S.A. INC.,** | **2:12-cv-00456** |
| **DONNA KARAN INTERNATIONAL INC.,** | **2:12-cv-00457** |
| **LVMH MOET HENNESSY LOUIS VUITTON INC.,** | **2:12-cv-00458** |
| **DOTS, LLC,** | **2:12-cv-00459** |
| **DRAPER'S & DAMON'S INC.,** | **2:12-cv-00460** |
| **EDDIE BAUER LLC,** | **2:12-cv-00461** |
| **ESPRIT US RETAIL LIMITED,** | **2:12-cv-00462** |
| **FACTORY CONNECTION LLC,** | **2:12-cv-00463** |
| **THE FINISH LINE INC.,** | **2:12-cv-00464** |
| **FOREVER 21 RETAIL INC.,** | **2:12-cv-00465** |
| **FORMAL SPECIALISTS LTD.,** | **2:12-cv-00466** |
| **FREDERICK'S OF HOLLYWOOD STORES INC.,** | **2:12-cv-00467** |
| **GROUPE DYNAMITE, INC. D/B/A GARAGE,** | **2:12-cv-00468** |
| **GUESS? RETAIL INC.,** | **2:12-cv-00469** |
| **H&M HENNES & MAURITZ LP,** | **2:12-cv-00470** |
| **HANESBRANDS INC.,** | **2:12-cv-00471** |
| **HOT TOPIC INC.,** | **2:12-cv-00472** |
| **HUGO BOSS FASHION INC.,** | **2:12-cv-00473** |
| **J. CREW GROUP INC.,** | **2:12-cv-00474** |
| **JIMMY JAZZ INC.,** | **2:12-cv-00475** |
| **JOS. A. BANK CLOTHIERS INC.,** | **2:12-cv-00476** |
| **ALCO STORES INC.** | **2:12-cv-00477** |
| **FRED'S INC.,** | **2:12-cv-00478** |
| **BAKERS FOOTWEAR GROUP,** | **2:12-cv-00479** |
| **BROWN SHOE COMPANY INC.,** | **2:12-cv-00480** |

| | |
|---|---|
| **COLLECTIVE BRANDS INC.,** | **2:12-cv-00481** |
| **CROCS INC.,** | **2:12-cv-00482** |
| **DSW INC. D/B/A DSW SHOE INC.,** | **2:12-cv-00483** |
| **FLEET FEET INC.,** | **2:12-cv-00484** |
| **GENESCO INC.,** | **2:12-cv-00486** |
| **HEELY'S INC,** | **2:12-cv-00487** |
| **JUSTIN BOOT COMPANY,** | **2:12-cv-00488** |
| **AMERICAN GREETINGS CORPORATION,** | **2:12-cv-00520** |
| **HALLMARK CARDS, INC.,** | **2:12-cv-00521** |
| **HICKORY FARMS INC.,** | **2:12-cv-00522** |
| **SPENCER GIFTS LLC,** | **2:12-cv-00523** |
| **INTERNATIONAL COFFEE & TEA, LLC,** | **2:12-cv-00524** |
| **THINGS REMEMBERED, INC.,** | **2:12-cv-00525** |
| **THE YANKEE CANDLE COMPANY,** | **2:12-cv-00526** |
| **BOSE CORPORATION,** | **2:12-cv-00527** |
| **GUITAR CENTER INC.,** | **2:12-cv-00528** |
| **PROGRESSIVE CONCEPTS INC.,** | **2:12-cv-00529** |
| **24 HOUR FITNESS WORLDWIDE INC.,** | **2:12-cv-00530** |
| **BALLY TOTAL FITNESS CORPORATION,** | **2:12-cv-00531** |
| **BARE ESCENTUALS INC.,** | **2:12-cv-00532** |
| **BIOSCRIP INC.,** | **2:12-cv-00533** |
| **CRABTREE & EVELYN,** | **2:12-cv-00534** |
| **CURVES INTERNATIONAL INC.,** | **2:12-cv-00535** |
| **GOLD'S GYM INTERNATIONAL INC.,** | **2:12-cv-00536** |
| **GREAT CLIPS INC.,** | **2:12-cv-00537** |
| **L.A. FITNESS INTERNATIONAL LLC,** | **2:12-cv-00538** |
| **LIFE TIME FITNESS INC.,** | **2:12-cv-00539** |
| **M.A.C. COSMETICS INC.,** | **2:12-cv-00540** |
| **MERLE NORMAN COSMETICS,** | **2:12-cv-00541** |
| **VITAMIN COTTAGE NATURAL FOOD MARKETS, INC.,** | **2:12-cv-00542** |
| **REGIS CORPORATION,** | **2:12-cv-00543** |
| **SALLY BEAUTY SUPPLY LLC,** | **2:12-cv-00544** |
| **SEPHORA USA INC.,** | **2:12-cv-00545** |
| **TONI&GUY USA, LLC,** | **2:12-cv-00546** |

| | |
|---|---|
| **ULTA SALON, COSMETICS & FRAGRANCE INC.,** | **2:12-cv-00547** |
| **VITAMIN SHOPPE INDUSTRIES, INC.,** | **2:12-cv-00548** |
| **EYEMART EXPRESS, LTD.,** | **2:12-cv-00549** |
| **LUXOTTICA RETAIL NORTH AMERICA INC.,** | **2:12-cv-00550** |
| **NATIONAL VISION INC.,** | **2:12-cv-00551** |
| **U.S. VISION INC.,** | **2:12-cv-00552** |
| **WILD BIRDS UNLIMITED INC.,** | **2:12-cv-00553** |
| **JOS. A. BANK CLOTHIERS INC.,** | **2:12-cv-00554** |
| **BUTH-NA-BODHAIGE INC.,** | **2:12-cv-00555** |
| **PSP GROUP, LLC,** | **2:12-cv-00556** |
| **WHERE 2 GET IT, INC.;** *et al.*, <br>      **Plaintiff,** <br> **v.** <br> **GEOTAG INC.,** <br>      **Defendant.** | **2:12-cv-00149** |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................v

TABLE OF AUTHORITIES ........................................................................................ vii

TABLE OF EXHIBITS ................................................................................................ ix

I.    BACKGROUND ...............................................................................................1

      A.    The Disclosed Embodiment. ...................................................................1

      B.    The Examiner Required the Addition of a "Dynamic
            Replication Limitation." ........................................................................3

      C.    The *Geomas v. Idearc* Claim Constructions Are Not Binding. ...........................4

II.   ARGUMENT.....................................................................................................5

      A.    "Topics" – Related Terms and Phrases.................................................5

            1.    A "Topic" Is Distinguished from Geographic
                  Information or Final Information (*e.g.*, Phone Number
                  or Address) Associated with an Entry or Data Record in
                  the Database. ...............................................................................7

            2.    A "Topic" Is an Independent, Searchable Category of
                  Goods or Services. ....................................................................10

            3.    GeoTag's "Plain and Ordinary Meaning" Position is
                  Unsupported and Untenable.....................................................12

            4.    The Claim Language Is Clear; the Claimed Database Is
                  First Organized Geographically and then Organized
                  Topically. ..................................................................................13

      B.    Entries and Data Records..................................................................15

            1.    Entry/Entries. ..........................................................................16

            2.    Data Record(s). ........................................................................20

      C.    Dynamic Replication. .......................................................................22

            1.    "Dynamically Replicated" and/or "Dynamically
                  Replicating." ............................................................................23

2.      The Larger "Dynamic Replication" Phrases..........................................27

3.      Area of Narrower-Smaller Expanse vs. Broader-Larger
        Expanse...................................................................................................31

D.      Geographic or Hierarchical Terms.......................................................32

1.      Geographical Hierarchies.' .................................................................32

2.      Search Area.............................................................................................36

3.      Organizing a Database . . . into a Plurality of Geographic
        Areas. ....................................................................................................38

E.      Database....................................................................................................39

1.      The "Database" Is Separate from the User's Browser............................39

2.      The Database Must Comprise a "Data Structure with
        Ordered Entries." ..................................................................................40

F.      On-line Information and Organizer. ....................................................41

1.      On-Line Information..............................................................................42

2.      Organizer................................................................................................43

G.      Remaining Terms....................................................................................45

# TABLE OF AUTHORITIES

CASES

*Apple, Inc. v. Samsung Elec. Co.*,
 No. 2012-1507, 2012 WL 4820601 (Fed. Cir. Oct. 11, 2012)................................................33

*Bicon, Inc. v. Straumann Co.*,
 441 F.3d 945 (Fed. Cir. 2006).......................................................................................8, 18

*Chimie v. PPG Indus.*,
 402 F.3d 1371 (Fed. Cir. 2005).........................................................................................20

*Civix-DDI, LLC v. Hotels.com*,
 No. 05 C 06869, 2010 WL 4386475 (N.D. Ill. Oct. 25, 2010) .................................................5

*Cohesive Techs., Inc. v. Waters Corp.*,
 543 F.3d 1351 (Fed. Cir. 2008).......................................................................................8, 18

*Comcast Cable Commc'ns Corp. v. Finisar Corp.*,
 No. C 02-04206, 2007 WL 1052821 (N.D. Cal. Apr. 6, 2007) .................................................5

*Cybor Corp. v. FAS Techs., Inc.*,
 138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) ..............................................................................5

*Datamize, LLC v. Plumtree Software, Inc.*,
 417 F. 3d 1342 (Fed. Cir. 2005).........................................................................................25

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
 672 F.3d 1270 (Fed. Cir. 2012).......................................................................................8, 18

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
 192 F.3d 973 (Fed. Cir. 1999)............................................................................................20

*Halliburton Energy Servs., Inc. v. M-I LLC*,
 514 F.3d 1244 (Fed. Cir. 2008).........................................................................................43

*In re Cortright*,
 165 F.3d 1353 (Fed. Cir. 1999).........................................................................................45

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
 302 F.3d 1352 (Fed Cir 2002).............................................................................................5

*Johns Hopkins Univ. v. Cellpro, Inc.*,
 152 F.3d 1342 (Fed. Cir. 1998)............................................................................................1

*Kraft Foods, Inc. v. Int'l Trading Co.*,
 203 F.3d 1362 (Fed. Cir. 2000).........................................................................................19

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
    672 F.3d 1350 (Fed. Cir. 2012)..................................................................................19

*Microsoft Corp., et al. v. GeoTag, Inc.*,
    No. 11-175-RGA (D. Del.) ...........................................................................................5

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
    403 F.3d 1364 (Fed. Cir. 2005)..................................................................................44

*Nilssen v. Motorola, Inc.*,
    80 F.Supp.2d 921 (N.D. Ill. 2000) ...............................................................................5

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)........................................................................6, 13, 21

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008)....................................................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).............................................................1, 12, 33, 37

*ResQNet.com, Inc. v. Lansa, Inc.*,
    346 F.3d 1374 (Fed. Cir. 2003)..................................................................................12

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*,
    412 F. App'x 270 (Fed. Cir. 2011) .............................................................................45

*SW Bell Tel., L.P. v. Arthur Collins, Inc.*,
    No. 3:04-cv-0669-B, 2005 WL 6225305 (N.D. Tex. Oct. 14, 2005) .......................5

*Tex. Instruments, Inc. v. Linear Techs. Corp.*,
    182 F. Supp. 2d 580 (E.D. Tex. 2002)..........................................................................5

*Vitronics Corp. v. Conceptronic Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)......................................................................................9

## STATUTES

35 U.S.C. § 112.............................................................................................................27

## **TABLE OF EXHIBITS**

**Exhibit A**      Defendants' Technology Tutorial Slides.

**Exhibit B**      '474 Patent File History - 11/25/97 Office Action.

**Exhibit C**      '474 Patent File History - 1/12/98 Response to Restriction Requirement.

**Exhibit D**      '474 Patent File History - 2/10/98 Office Action.

**Exhibit E**      Mark R. Brown, Using Netscape 2 (2nd ed.) (Que Corp. 1995).

**Exhibit F**      '474 Patent File History - 7/28/98 Summary of Examiner Interview.

**Exhibit G**      '474 Patent File History - 12/9/98 Search Request Form.

**Exhibit H**      '474 Patent File History - 8/10/98 Amendment and Response to Office Acton.

**Exhibit I**      Hearing Transcript (11/20/2012), *Microsoft Corp., et al. v. GeoTag, Inc.*, No. 11-175-RGA (D. Del.).

**Exhibit J**      "Topics" - Terms, Proposed Constructions, and a Representative Claim.

**Exhibit K**      GeoTag's Technology Tutorial Slides.

**Exhibit L**      GeoTag's Technology Tutorial Transcript.

**Exhibit M**      Webster's New Universal Unabridged Dictionary (1996).

**Exhibit N**      "Entries" and "Data Records" - Terms, Proposed Constructions, and a Representative Claim.

**Exhibit O**      Computer Dictionary (Microsoft Press) (1997).

**Exhibit P**      "Dynamic Replication" - Terms, Proposed Constructions, and a Representative Claim.

**Exhibit Q**      Claims 1, 20, and 31 (Highlighted)

**Exhibit R**      Markman Order (11/20/2008), *Geomas (Int'l) Ltd. v. Idearc Media Services-West, Inc.*, No. 2:06-cv-475 (E.D. Tex).

**Exhibit S**      Geomas Opening Claim Construction Brief (6/6/2008), *Geomas (Int'l) Ltd. v. Idearc Media Services-West, Inc.*, No. 2:06-cv-475 (E.D. Tex).

**Exhibit T**      Geomas Reply Claim Construction Brief (6/28/2008), *Geomas (Int'l) Ltd. v. Idearc Media Services-West, Inc.*, No. 2:06-cv-475 (E.D. Tex).

| | |
|---|---|
| **Exhibit U** | Joint Claim Construction Brief (11/6/2012), *Microsoft Corp., et al. v. GeoTag, Inc.*, No. 11-175-RGA (D. Del.). |
| **Exhibit V** | "Area of Narrower-Smaller Expanse vs. Broader-Larger Expanse" - Terms, Proposed Constructions, and a Representative Claim. |
| **Exhibit W** | "Geographical Hierarchies" - Terms, Proposed Constructions, and a Representative Claim. |
| **Exhibit X** | *Apple, Inc. v. Samsung Elec. Co.*, No. 2012-1507, 2012 WL 4820601 (Fed. Cir. Oct. 11, 2012) |
| **Exhibit Y** | Dictionary of Computing (Prentice Hall 1992). |
| **Exhibit Z** | "Search Area" - Terms, Proposed Constructions, and a Representative Claim. |
| **Exhibit AA** | "Organizing a Database . . . into a Plurality of Geographic Areas" - Terms, Proposed Constructions, and a Representative Claim. |
| **Exhibit BB** | "Database" - Terms, Proposed Constructions, and a Representative Claim. |
| **Exhibit CC** | GeoTag's Preliminary Claim Constructions And Extrinsic Evidence Pursuant To Local Patent Rule 4-2. |
| **Exhibit DD** | "On-line Information and Organizer" - Terms, Proposed Constructions, and a Representative Claim. |

Pursuant to the Court's First Amended Scheduling and Discovery Order,[1] Defendants—through the designated Lead Defendant—hereby respond to Plaintiff GeoTag, Inc.'s ("GeoTag") Opening Claim Construction Brief ("Opening Brief") and submit their Responsive Claim Construction Brief for construction of terms in U.S. Patent No. 5,930,474 (the "'474 Patent").

Defendants' constructions find their support primarily in the language of the claims and, in some cases, attempt to clarify Magistrate Judge Everingham's prior claim constructions to provide more meaningful interpretations for the jury.   In contrast, GeoTag's often vague constructions do not provide sufficient guidance for the jury and mechanically rely on Magistrate Judge Everingham's constructions without taking into account their preliminary nature and the more complete record before this Court.

As the Court is familiar with general claim construction standards and related legal precedents, Defendants will refrain from reciting them here.   Rather, Defendants will focus on the legal precedents specific to the Parties' claim construction positions.[2]

# I.    BACKGROUND

## A.    The Disclosed Embodiment.[3]

The '474 Patent discloses an invention that was meant to address certain shortcomings of

---

[1]    *See, e.g.*, Case No. 2:10-cv-570, Dkt. No. 506.  For the sake of clarity, all citations to the docket will be to Case No. 2:10-cv-570.  Identical versions of each cited document can be found in each of the above-captioned cases.

[2]    Defendants also incorporate by reference their Technical Tutorial, which was submitted to the Court on October 11, 2012.  For the Court's convenience, Defendants' Tutorial slides are resubmitted as Exhibit A.

[3]    GeoTag's Opening Brief relies heavily on the accusation that Defendants' proposed constructions improperly import limitations from the single "preferred embodiment" described in the '474 Patent into its claims.  *See, e.g.*, Opening Brief at 5-6.  GeoTag's "preferred embodiment" argument is misplaced as the patent specification only discloses a single embodiment.  Defendants do not import limitations from the sole embodiment described in the specification but rather look to that embodiment in construing the claims "as highly indicative of the scope of the claims."  The Federal Circuit has been clear that the specification is highly relevant to claim construction and where—as here—there is only one disclosed embodiment, that embodiment is highly indicative of claim scope.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (stating that "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."); *see also Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) (stating that "the only disclosed embodiment of the claimed [invention] is highly indicative of the scope of the claims").

Internet database and search engine technologies in the mid-1990's.[4]  Its disclosure focuses on an Internet "organizer" that purports to allow users to search for information geographically and then topically.   The organizer has several parts: (1) a geography database organized hierarchically; (2) a topical database; (3) a Yellow Pages database; and (4) a search engine.

The first part of the disclosure—the geography database—is the disclosure's centerpiece.[5]  This database is organized into a hierarchy of geographical areas in which broader geographical areas encompass narrower geographical areas.[6]  For instance, the city of Los Angeles might be organized in the geography database as: United States/California/Southern California/Los Angeles.  According to the '474 Patent, the geography database allows a user to "ascend or descend in the geographic hierarchy to the particular geographic area about which information is desired."[7]

The second part of the disclosure—the topical database—contains topical information for the selected geographical area.[8]  The topics are arranged as categories of goods and services and each topic may—but does not necessarily—have sub-topics.  For example, the topic "schools" in the geographical area "Los Angeles" might include the subtopics elementary schools, high schools, colleges and universities located in Los Angeles.[9]

The third part of the disclosure—the Yellow Pages database—contains specific information about listings within a selected topic.  For instance, if the user selects a particular

---

[4]   '474 Patent at 2:20-39.

[5]   The '474 Patent application originally contained two sets of distinct claims. The first was "drawn to a search engine for remotely accessing data from a database where the data is arranged geographically and topically." The second was "drawn to a display composer that generates a display page."  11/25/97 Office Action at 2 (attached as Exhibit B).  The Examiner required the patentees to elect a claim set.  The patentees abandoned the claims drawn to a display and elected the search engine set. 1/12/98 Response to Restriction Requirement (attached as Exhibit C).

[6]   '474 Patent at 12:27-32.

[7]   *Id.* at 9:1–4.

[8]   *Id.* at Fig. 2B.

[9]   *Id.* at Fig. 2B

elementary school in Los Angeles, the Yellow Pages database might contain the contact information for the school (*e.g.*, the school's phone number, fax number, or address).[10]

The fourth part of the disclosure—the search engine—searches for, and retrieves information from, the geography database (as well as from the topical and Yellow Pages databases).[11]   In contrast to systems where a user enters search terms or keywords, the '474 Patent teaches that the search engine allows a user to browse information by first selecting a geographical area and then a topic within that area "using standard point-and-click techniques."[12]

## B.   The Examiner Required the Addition of a "Dynamic Replication Limitation."

A mere geography database organized hierarchically and topically as originally claimed was not new.  Indeed, the Examiner rejected all of the '474 Patent application's original claims because the prior art Yahoo! database disclosed "a database of information organized into a hierarchy of geographical areas wherein the information corresponding to each one of said hierarchy of geographical areas is further organized into topics."[13]  The Examiner explained that Yahoo!'s "Regional" database was geographically organized based on a hierarchy of geographical areas, including countries, regions, and states, just as in the original claims of the '474 Patent Application.[14]

Following an interview with the Examiner, the Examiner issued an Interview Summary stating: "The dynamic replication of an entry in [sic] narrow geographical area would overcome prior art of record."[15] The Examiner also noted that "dynamic replication" had synonyms such as

---

[10]   *Id.*  at Fig. 2C.

[11]   *Id.* at 11:20-34.

[12]   *Id.* at 2:52-54.

[13]   2/10/98 Office Action at 3 (attached as Exhibit D).

[14]   Mark R. Brown, Using Netscape 2 (2nd ed.) (Que Corp. 1995) at 184 (attached as Exhibit E).

[15]   7/28/98 Summary of Examiner Interview (attached as Exhibit F).

"automatic inheritance," which she equated to a parent-child relationship and "inheriting attributes."[16]   The patentees did not dispute the Examiner's understanding of "dynamic replication."

Despite "dynamic replication" not appearing anywhere in the specification, it was identified as the basis for the invention's alleged novelty during the interview.  The patentees confirmed that they added the "dynamic replication" limitation to all independent claims to secure the claims: "[Patentees] have amended Claims 1, 32, 38 and 43 to clarify the patentability [sic] distinguishing features of [Patentees'] inventions . . . ."[17]

### C.    The *Geomas v. Idearc* Claim Constructions Are Not Binding.

GeoTag argues that the Court should simply adopt Magistrate Judge Everingham's claim constructions from *Geomas v. Idearc*, Eastern District of Texas Case No. 06-CV-475 ("*Idearc*") in full.  GeoTag was effectively a party to the *Idearc* litigation because it is the successor-in-interest to Geomas.  The Defendants in this litigation, however, were not involved.  GeoTag seeks to impose the prior constructions on the Defendants even though (1) in some cases the *Idearc* parties stipulated to the constructions; (2) the District Judge never reviewed the Magistrate's constructions;[18] and (3) the *Idearc* constructions were never tested—either by the district court or an appeal to the Federal Circuit—because the case settled.  GeoTag claims that the *Idearc* constructions are "correct" and should be adopted "*in toto*."[19]  GeoTag provides no rationale for such wholesale adoption and the Court should decline to do so for at least the following three reasons.

First, prior claim construction orders are not binding on those who were not parties to the

---

[16]   12/9/98 Search Request Form (attached as Exhibit G).

[17]   8/10/98 Amendment and Response to Office Acton at 7 (attached as Exhibit H).

[18]   Indeed GeoTag admits in its brief that "[n]o objections were made in *Geomas* to the constructions of Magistrate Judge Everingham" because the case settled.  Opening Brief at n.2.

[19]   *Id.* at 1.

earlier action.[20]  Moreover, stipulated claim constructions—such as some *Idearc* constructions—should carry little, if any, weight in a later dispute between different parties.[21]

Second, the Federal Circuit has endorsed the practice of revisiting claim constructions as understanding of the case develops.  Claim constructions are not final orders, and, therefore, the Court should engage in "rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."[22]

Third, claim construction is reviewed *de novo*.[23]  Accordingly, while a court should be "respectful" of prior claim construction orders, it is "not compelled to reach the same conclusions."[24]  Indeed, this is the approach Judge Andrews appears inclined to adopt in the parallel declaratory judgment action currently pending in Delaware.[25]

## II.    ARGUMENT

### A.    "Topics" – Related Terms and Phrases.[26]

The concept of a "topic" and topical organization is central to the '474 Patent, as evidenced by its title, "Internet Organizer for Accessing Geographically and Topically Based Information."[27]  The meaning of the claim term "topics" and the concept of topical organization is apparent from the specification and claims of the '474 Patent.  GeoTag, however, argues for

---

[20]    *See Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589-90 (E.D. Tex. 2002) (when the same patent claims have already been construed in a prior action, there is "no authority, either binding or persuasive, that instructs that [a court] must utilize the [prior] claims construction"); *Comcast Cable Commc'ns Corp. v. Finisar Corp.*, No. C 02-04206, 2007 WL 1052821, at *2 (N.D. Cal. Apr. 6, 2007); *see also SW Bell Tel., L.P. v. Arthur Collins, Inc.*, No. 3:04-cv-0669-B, 2005 WL 6225305, at *4-*5 (N.D. Tex. Oct. 14, 2005).

[21]    *See, e.g., Civix-DDI, LLC v. Hotels.com*, No. 05 C 06869, 2010 WL 4386475, at *3 (N.D. Ill. Oct. 25, 2010).

[22]    *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed Cir 2002).

[23]    *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*).

[24]    *Nilssen v. Motorola, Inc.*, 80 F.Supp.2d 921, 926 n.4 (N.D. Ill. 2000) (later claim construction argument "will receive an independent review to ensure fairness to the parties in [the later] litigation").

[25]    Hearing Transcript (11/20/2012) at 11:3-9, *Microsoft Corp., et al. v. GeoTag, Inc.*, No. 11-175-RGA (D. Del.) (attached as Exhibit I).

[26]    Exhibit J sets out the terms, proposed constructions, and a representative claim with the relevant terms highlighted.  GeoTag's Opening Brief discusses these terms on pages 15-16 and 25-27.

[27]    '474 Patent at [54] (emphasis added).

"plain meaning" so that it can improperly manipulate the meaning of "topics" to suit its purposes in litigation.  For example, GeoTag represented to the Delaware Court that individual "phone numbers" or "addresses" could satisfy the "topics" requirements of the '474 Patent.[28]  The Delaware Court disagreed, correctly noting that the specification passage relied on by GeoTag was (i) taken out of context and (ii) failed to support GeoTag's position.[29]  Like the Delaware Court, Defendants also disagree with GeoTag's position because it is contradicted by the claim language and the specification of the '474 Patent.  The '474 Patent uses the term "topics" and the concept of topical organization in a specific manner, and Defendants' constructions conform to this intrinsic evidence.

Thus, GeoTag's misapplication of the term "topics" and the concept of topical organization has created a fundamental dispute between the Parties that requires a construction by the Court.[30]  Accordingly, Defendants respectfully request that the Court construe "topics" and certain phrases concerning topical organization as set forth below in Defendants' Proposed Constructions.

---

[28]  Exhibit I (Hearing Transcript (11/20/2012)) at 112-13 ("The Court: Could an address or a phone number be a topic?  [Counsel for GeoTag]: Well, actually, your Honor, if you go back to column 15, line 58, actually, you start at line 56.  I will read it. That is, when the user wishes to access information about individual goods, services or other topics, i.e., final destinations, the views are points and clicks. Final destinations, your Honor, <u>sounds like it could be an address to me</u>." (emphasis added)).

[29]  As the Delaware Court noted, the passage relied on by GeoTag's counsel takes a single clause out of context. *Id.* at 113 ("The Court: I think that's probably not modifying other topics. I think that's probably modifying the whole phrase."); *see also* '474 Patent at 15:56-62 ("That is, when the user wishes to <u>access information</u> about individual goods, services, or other topics, (<u>i.e., final destinations</u>), the user points to and clicks over the given topic or subtopic <u>in order to view the individual information pertaining to that topic</u> or subtopic." (emphasis added)); *id.* at 15:41-44 ("In addition, if a given topic or subtopic <u>includes final destinations (i.e., subjects about which information such as telephone numbers, addresses, etc., is available</u>), such information may be presented for viewing by the user by accessing the yellow pages database 245, as described." (emphasis added)).

[30]  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on the term's 'ordinary' meaning does not resolve the parties' dispute.").

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "topics" and/or "topic" and/or "topically" (Claims 1, 20, and 31) | An independent, searchable category of related goods or services, as distinguished from geographic information and the entries or data records associated with that category. | No need to construe.  Plain and ordinary meaning. |
| "entries corresponding to each one of said hierarchy of geographical areas is further organized into topics" (Claim 1)<br><br>"entries corresponding to each of said hierarchy of geographical areas is further organized into topics" (Claim 20)<br><br>"organizing said entries corresponding to said plurality of geographical areas into one or more topics" (Claim 31) | After the database is geographically ordered, further ordering the database entries for each particular geographic area into topics that are associated with that particular geographic area (as distinguished from geographically differentiated listings for the same topic). | Data in the database associated with a geographic area in the hierarchy of geographical areas is further organized to permit selected data to be retrieved into topics. (Claims 1 and 20).<br><br>Organizing data contained in the database corresponding to one or more geographical areas to further permit selected data to be retrieved into one or more topics.  (Claim 31). |

> **1.  A "Topic" Is Distinguished from Geographic Information or Final Information (*e.g.*, Phone Number or Address) Associated with an Entry or Data Record in the Database.**

GeoTag erroneously conflates "topics" with other concepts and terms contained in the claims—namely, geographical information and the information contained in each entry or data record (*e.g.*, phone number or address) that is associated with a store or point of interest.

The patentees' chosen claim language expressly <u>distinguishes</u> between "geographic information," "topics," and information within each "entry" and "data record" because it expressly uses these <u>different</u> terms and phrases.  For example, Claim 1 uses separate terms or phrases for (i) the organization into "geographical information," (ii) the organization into "topical information," and (iii) the entries corresponding to or associated with said geographic

and topical organization.[31]   Thus, each of these concepts (entries, topics, and geographical

information) should be construed differently from the others.[32]

The specification likewise teaches that a "topic" differs from the "final destination

information" in each claimed entry or data record.[33]   Figures 2A, 2B, and 2C further emphasize

the distinction between the geographic, topical, and final destination information.[34]   In particular,

Figure 2C illustrates that topical information (*e.g.*, the particular "category of goods or services")

differs from final destination information (*e.g.*, the address, phone number, or fax number)

associated with an entry:[35]



---

31  *See* '474 Patent at Claim 1 ("information organized into a **[i]** hierarchy of geographical areas wherein **[ii]** entries corresponding to each one of said hierarchy of geographical areas is **[iii]** further organized into topics" (emphasis and numerals added)).

32  *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting the "well-established rule that 'claims are interpreted with an eye toward giving effect to all terms in the claim'"); *see also Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008) (same); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (same).

33  '474 Patent at 15:57-61 ("when the user wishes to access information about individual goods, services, or other topics, (i.e., final destinations), the user points to and clicks over the given topic or subtopic in order to view the individual information pertaining to that topic or subtopic." (emphasis added)).

34  *Id.* at Figs. 2A, 2B, and 2C.  Figure 2A shows that geographic and topical information are separate, and that the claimed invention first requires geographic organization and selection before turning to topical selection.  '474 Patent at 9:11-14 ("That is, once the user has selected the appropriate geographic area about which information is desired, the user changes to topical references…..").  Figure 2B (at 235) and Figure 2C (at 240) together show that only after the user has completed his or her selection of topics and subtopics does the invention turn to the Yellow Pages database and retrieve specific information about listings within a particular topic—which shows the specific information about a listing (for example, a final destination) cannot be a "topic" itself.  *Id.* at 9:55-66 ("Once the user has selected a topic for which there are no further subtopics, the web organizer server 114 accesses information relating to particular companies, enterprises, institutions, organizations, or entities associated with the selected topic . . . .   For example, a list of particular stores such as 'Bill's Hardware' and 'ACE Hardware' may be accessible under the topic 'hardware stores.'").

35  *See also id.* at 10:19-23 ("[A]s shown in FIG. 2C, the yellow pages database may include information such as the address, phone number, fax number, E-mail, other miscellaneous information, etc., which relates to the particular topic or subtopic selected by the user.").

Figure 18, which is an "exemplary screen display which is presented to the user when the user accesses final destination information," makes this distinction apparent.  There, the geographic information ("Los Angeles"), the topical information ("Hospitals & Health Services"), and the final information contained in each entry (*e.g.*, the address and phone number for Children's Hospital) are distinct from one another:

```
                   Los Angeles Directory
                       KeywordListing


          Hospitals & Health Services (18 of 18)
          Health Services Depatment 800-427-8700
          Admin. Office-313 N Figueroa Los Angeles

          General Hospital 213-226-2622
          1200 N State Los Angeles

          Womens Hospital 213-226-2622
          1240 N Mission Rd Los Angeles

          Martin Luther King Jr. General 310-668-4321
          12021 S Wilmington Ave. Los Angeles

          Health Services Information 213-250-8055 Los Angeles

          Children's Hospital 213-226-2622
          1129 N State Los Angeles
```

Notably, contrary to GeoTag's argument, nothing in the specification equates a "topic" with an "entry" or geographical information.  Any construction conflating these three independently claimed concepts would thus improperly exclude the preferred (and only) embodiment demonstrated in Figures 2A, 2B, 2C, and 18.[36]

Indeed, GeoTag agrees that "entries and data records <u>are not limited to either geographical information or topics but may be associated with both</u>."[37]  The fact that entries are not so limited and may further be <u>associated</u> with geography and topics supports Defendants' position that the three concepts are distinct from one another.  Both the claim language and the

---

[36]   *See Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277-78 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.").

[37]   Opening Brief at 27 (emphasis added).  *See also Id.* at 26 (the "claims clearly . . . explain[] that entries and data records may be associated with a topic and a geographical area"); *id.* (explaining that Claim 1 and Claim 18 allow entries or data records to be "associated" with topics and geographical areas).

specification support a construction wherein the information contained in each entry (*e.g.*, the business name, address, or phone number for Children's Hospital)[38] is not the same as the geography (*e.g.*, Los Angeles) or the topic (*e.g.*, Hospitals and Health Services) that the entry is <u>associated with</u>.  Because the claim language and specification distinguish the final destination information contained in the entries from the geographical and topical information, the Court should construe "topics" to reflect this distinction.

## 2. A "Topic" Is an Independent, Searchable Category of Goods or Services.

Defendants' proposed construction of "topics"—"an independent, searchable category of related goods or services"—is consistent with the claims and the specification.

First, a "topic" relates to a "category" of goods or services, and not any one entry within a topic.[39]  As repeatedly demonstrated throughout the '474 Patent, topics are, by way of example, "Jobs," "Entertainment," "Schools," or "Hardware Stores."[40]  By being a category, a "topic" therefore must retain a categorical level of generality.  A "topic" therefore cannot be something as specific as a particular job, a particular play, a particular elementary school, or a particular hardware store.  The claims require a "search engine further configured to search said topics."[41]  Accordingly, the claimed "topics" are "searchable."  As explained above (*see* Section II.A.1), "topics" are necessarily independent of both the geographic information and the final information contained in each entry.  In addition, "topics" should be construed as "independent"

---

[38]  *See id.* at 11 (agreeing that the specification depicts sample "entries" that contain information such as business name, address, phone number, etc.).

[39]  Indeed, in GeoTag's Technology Tutorial, GeoTag's own expert consistently refers to "topics" as "categories." GeoTag Technology Tutorial at Slides 18-22, 71 (attached as Exhibit K); *see also* GeoTag Technology Tutorial Transcript at Slides 18-22 ("Web directories grouped web pages into topics or <u>categories</u>" (emphasis added)) and 71 ("Figure 16 of the '474 patent describes an embodiment of the invention that uses a folder name (shown in box 1600) as an index to organize topical data.  All sub-<u>topics</u> (or sub-<u>categories</u>) are then organized under this folder name." (emphasis added)) (attached as Exhibit L).

[40]  *See, e.g.*, '474 Patent at 5:64, 9:29-34, and 9:60-63.

[41]  *Id.* at Claim 1; *see also id.* at Claim 20 (same), Claim 26 ("means for searching said topics"), and Claim 34 ("directing search engine to maneuver among said topics").

categories of goods or services, to distinguish independent topics from dependent subtopics.  In other words, "topic" is an abstract term that categorizes the data contained within it and, therefore, is not the same as the constituent entries and data records.[42]

Further, the specification repeatedly describes "topics" as categories of goods or services that are related.[43]  The Abstract states "the local content database includes information about general goods or services available within a given geographic location . . . ."[44]  Moreover, Figure 10 depicts "a list of topics within a selected geographical region," where each "topic" is a category of related goods or services (*e.g.*, "Amusement Parks" or "Hospitals & Clinics").



Figure 2B further illustrates that the topical index described within the '474 Patent contains categories of goods and services (*e.g.*, schools), and separately lists potential sub-categories of

---

[42]   *See id.* at 5:59-65 (defining "jobs" as a single topic, meaning that different types of jobs  (*e.g.*, retail jobs vs. accounting jobs") are dependent subtopics rather than the independent "topics").

[43]   *Id.* at [57] (the database includes both "information about general goods and services" and "specific goods and services in the geographic location" (emphasis added)); 7:11-16 ("if the user is interested in finding an out-of-print book, or a good price on his favorite bottle of wine, but does not want to travel outside of the Los Angeles area to acquire these goods, then the user can simply designate the Los Angeles area as a geographic location for which a topical search is to be performed" (emphasis added)); 7:28 ("find the goods or services in which he is interested" (emphasis added)); 9:15-16 ("the user is able to geographically pinpoint the location of the desired goods or services in which the user is interested") (emphasis added)); 15:57-58 ("individual goods, services, or other topics"); *see also id.* at 9:28-30 ("the topic list presented to the user includes a list of topics such as business services, entertainment, news, consumer goods, historic sites, etc.").

[44]   *Id.* at [57].

goods and services (*e.g.*, elementary schools, high schools and colleges & universities).[45]



Thus, consistent with the claim language, the specification teaches that the claimed topics are "independent, searchable categories of related goods or services."

### 3.      GeoTag's "Plain and Ordinary Meaning" Position is Unsupported and Untenable.

GeoTag's proposal to give the term "topics" its plain and ordinary meaning fails to account for the unequivocal meaning that the claims and the specification give to the term. Tellingly, GeoTag cites no evidence that "topics" even has a plain and ordinary meaning to one of ordinary skill in the art, or what that meaning would be.  Lacking any evidence, GeoTag impermissibly relies on lawyer argument.  But this approach likewise fails to withstand scrutiny. Webster's Dictionary defines "topic" as "the subject of conversation or discussion: to provide a topic for discussion."[46]   Such a broad definition ignores the context of the invention and the patentees' use of the term "topic" throughout the '474 Patent.[47]

Finally, as described above, "plain and ordinary meaning" will not resolve the Parties'

---

[45]    *Id.* at Fig. 2B; s*ee also id.* at Fig. 2C ("category of goods or services").

[46]    Webster's New Universal Unabridged Dictionary at 1997 (1996) (attached as Exhibit M).

[47]    *See Phillips.*, 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1378 (Fed. Cir. 2003) ("[A] patent applicant may consistently and clearly use a term in a manner either more or less expansive that its general usage in the relevant community, and thus expand or limit the scope of the term in the context of the patent claims").

dispute, which necessitates a construction by the Court.[48] Applying plain and ordinary meaning to "topics" would provide little guidance to either the Parties or a lay jury. Accordingly, the Court should reject GeoTag's proposal and construe "topics" as discussed above.

### 4. The Claim Language Is Clear; the Claimed Database Is First Organized Geographically and then Organized Topically.

With respect to the three remaining "topics" phrases,[49] which GeoTag agrees require construction, the claims require that geographic organization takes place <u>before</u> topical organization. Indeed, each independent claim is structured toward geographic organization <u>first</u> before turning to topical organization. Take, for instance, the structure of Claim 1:

| The '474 Patent claims: | "information organized into a hierarchy of geographical areas wherein entries corresponding to each one of said hierarchy of geographical areas is ***further organized*** into topics"[50] |
|---|---|
| The '474 Patent **does not** claim the reverse: | information organized into topics wherein entries corresponding to each one of said topics is further organized into a hierarchy of geographical areas |

The claim language thus requires that a correspondence to geography must be established <u>before</u> topical organization is considered.[51]

The specification also distinguishes between the two options presented above and

---

[48] *O2 Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance of the term's 'ordinary' meaning does not resolve the parties' dispute.").

[49] These phrases are "entries corresponding to each one of said hierarchy of geographical areas is further organized into topics" (Claim 1); "entries corresponding to each of said hierarchy of geographical areas is further organized into topics" (Claim 20); and "organizing said entries corresponding to said plurality of geographical areas into one or more topics" (Claim 31).

[50] '474 Patent at Claim 1; *see also id.* at Claim 20 ("database of information organized into a predetermined hierarchy of geographical areas . . . and wherein entries corresponding to each of said hierarchy of geographical areas is further organized into topics"); Claim 26 ("entries corresponding to each of said geographical areas is further organized into topics"); Claim 31 ("organizing a database of on-line information into a plurality of geographical areas . . . and organizing said entries corresponding to said plurality of geographical areas into one or more topics").

[51] *Id.*

emphasizes that the '474 Patent is only directed toward the first option (*i.e.*, organizing first geographically and then topically):

> [A]t specified levels of the geographically organized information, the user is presented with the option of accessing topically organized information from among several topic selections, wherein the <u>topical information is customized for each geographic area to reflect topics indigenous to that area</u>. Thus, each of the lists is primarily related by association with physical attributes within a particular geographic area. That is, although the topic selections associated with a particular geographical area may be related by chance (*e.g.*, a particular chain of restaurants may be owned by the same company as another chain of bakeries) <u>the essential reason for grouping the topics together is that they are associated with the same geographic area</u>. Thus, **<u>such a system is distinguished from systems which have geographically differentiated listings for the same topic</u>** (such as job search databases which include information about jobs in different cities), **<u>since these listings are primarily related to the topic (*e.g.*, jobs), not to the geographical area</u>**.[52]

Consistent with the claims, the specification teaches organizing first geographically and then topically.[53]  The specification distinguishes this from <u>what is **not** found in the claims</u>—namely, organizing first topically and then geographically, which the specification describes as "geographically differentiated listings for the same topic."

GeoTag's proposed construction is also untenable with respect to the requirement that entries are "further organized into topics."   GeoTag proposes a construction that entries are "further organized *to permit selected data to be retrieved into topics*."[54]  GeoTag's proposal should be rejected because it improperly changes the required active ordering of entries (*i.e.*, the organization into topics) into a vague and passive "permission to retrieve" data.  GeoTag's passive construction, however, ignores the explicit limitations of the claim language and fails to

---

[52]   *Id.* at 5:47-65 (emphasis added).

[53]   *See also* note 34 above (citing '474 Patent at Figure 2A and 9:11-14).

[54]   Opening Brief at 15-16 (emphasis added).

inform how entries are organized into topics.  As a result, GeoTag's passive construction could easily be misinterpreted to extend to the type of subject matter or keyword searches that are disclaimed by the '474 Patent.[55]

Thus, Defendants' proposed construction for these phrases is consistent with both the claim language and specification and should be adopted by the Court.

### B.    Entries and Data Records.[56]

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "entries" and/or "entry" (Claims 1, 20, and 31) (Dependent claims 18, 23, 24, 25, and 39) | A listing contained in the database that includes multiple data records. | Data contained in the database. |
| "data record(s)" (Dependent claims 18, 19, 24, 25, 30, and 36) | One or more fields within an entry (*e.g.*, phone number, address). | No need to construe.  Plain and ordinary meaning. |

Defendants propose constructions of the terms "entry" and "data record" that are consistent with the specification, claims, and prosecution history of the '474 Patent.  In contrast, GeoTag improperly requests a construction of "entry" based on the broad, vague concept of "data" and no construction of "data record."   GeoTag's positions (1) completely ignore the specific, structured format of the information in the database defined by the '474 Patent, (2) wholly fail to distinguish an entry from a data record, and (3) impermissibly seek to recapture disclaimed scope.

The '474 Patent's specification uses the terms "record" and "entry" synonymously.[57]

---

[55]   *See* '474 Patent at 2:28-31 ("In certain instances, a user may desire to access information predicated upon geographic areas as opposed to by subject matter or keyword searches.").

[56]   Exhibit N sets out the terms, proposed constructions, and representative claims with the relevant terms highlighted.  GeoTag's Opening Brief discusses these terms on pages 10-11 and 23-25.

[57]   For example, the '474 Patent specification states that sample *entries* for the various databases are described in Tables 7 and 8.  '474 Patent at 18:62-63; 23:15-16.   Both Table 7 and Table 8 show sample *records*, thus between the text and the table, the terms "entry" and "record" are used synonymously.  In Table 8, for example,

The claims, however, use only the term "entry."  Several of the dependent claims use the term "data records," but it is clear from the intrinsic evidence that this term is used to describe the fields that make up the entry, and not the entry itself.  Accordingly, the terms "entry" and "data record" are distinct, and both must be construed.

### 1.    Entry/Entries.

Defendants' proposed construction of "entry" is supported by the intrinsic record, as both the specification and the claims use "entry" to identify a specific structure of the information in the database that contains multiple fields—which, in the language of the claims, are called "data records."

According to the '474 Patent, the information in the database is not just loose data or unstructured information.  The specification consistently describes and depicts the "**format of data** stored within" the database(s) by showing entries containing multiple fields.[58]   The structure of an "entry" in the database is repeatedly described in the specification of the '474 Patent.[59]

For example, Figure 18 shows an exemplary screen shot displayed to a user viewing information from the Yellow Pages database.[60] As can be seen at the top of Figure 18 (shown above at Section II.A.1), the information displayed is for the geographic area of Los Angeles, for the topic "hospitals & health services."  Each item in the list of "hospitals and health services" presented in Figure 18 contains information corresponding to a separate *entry* in the database.

---

each sample entry is referred to as a record, such as "Local Content List Record", "Local Content List Category Record", *etc*.

[58]   *Id.* at 18:60-63; 23:14-16; 24:29-31 (emphasis added);*see, e.g.*, *id.* at Fig. 13 and Table 7 ("FIG. 13 is a schematic diagram which illustrates the format of data stored within the geographic database 210.  Sample *entries* for the geography database 210 are included in Table 7.  A first field 1300, …" (*id.* at 18:60-63)).

[59]   *See also id.* at Fig. 16 and Tbl. 8, showing "sample entries" to illustrate the data format for the local content database (*id.* at 23:14-16), and Fig. 17 and Tbl. 9, showing "sample entries" to illustrate the data format for the yellow pages database (*id.* at 24:29-31).

[60]   *Id.* at 16:33-36.

This is illustrated in Table 9, which contains two *sample entries* in the database—"Children's Hospital" and "General Hospital"—corresponding to those identically named items in Figure 18. Examining the entry for "Children's Hospital" from Table 9 shows the name of the entry, location information, keyword information, and more:

TABLE 9

| | | |
|---|---|---|
| Expire Date: | 12/04/96 | |
| Name: | Children's Hospital | |
| Address: | 1129 N State | |
| City, State: | Los Angeles, CA | Zipcode: |
| Phone: | 213-226-2622 | Fax: |
| EMail: | | |
| Skeleton HTML: | /HTTPSKEL/STDYP.HTM | |
| Bullet: | | |
| URL: | | |
| | _Buttons_ | |
| Button Count: | 0 | |
| More . . . : | Image: | |
| | _Keywords_ | |
| SIC Code: | | |
| Keywords: | City Government, Hospitals & Health Services | |
| Ext. Price: | 0 | |
| | _Description_ | |

The structure of the entry for "Children's Hospital" matches the structure set forth in Figure 17, detailing the specific fields of the entry, including the expiration date, name, address, city, state, *etc*. In support of the figures and tables, the specification also describes in detail the "format of data stored in the . . . database," which shows that the sample entries included as Table 9 are listings that include multiple fields:

> An expiration date field 1700 includes the date or dates that this listing expires, while a name field 1705 includes, in text form, the name to be shown on the listing. Address and city fields 1710, 1715, respectively show the street address to be shown on the listing and the city name. In addition, a state field 1720 as well as a zip code field 1725, respectively, include the state name and the postal or zip code of the listing. Phone and fax fields 1730, 1735, respectively, include the phone number of the listing to be displayed to the user and the facsimile phone number for the same listing. [and continuing on to describe numerous additional fields contained in the entries].[61]

Nonetheless, GeoTag asks this Court to ignore the "format of data stored within the . . . database" as detailed in the '474 Patent's specification, figures, tables, and claims.

---

[61]   *Id.* at 24:29-43.

GeoTag requests a construction for "entries"—"data contained in the database"—that resists any structure or format whatsoever and is so overly broad and vague that it could be anything from a single character to the entire database.  But, the intrinsic evidence of the '474 Patent shows that "entries" are the actual records that are searched by the search engine, some or all of which are returned by the search.[62]  The claims also rely on the term "entry" to further describe the invention's alleged novelty, as it is an *entry* that the search engine "dynamically replicates."[63]

GeoTag's proposed construction ignores the key point of "entry" in the context of the '474 Patent.  Indeed, it is the structured entry in the database that provides the association between fields that is pivotal to the invention's alleged novelty.  Without the combination of topical information and associated geographical information, as provided by each entry, the invention does not function.  The construction for "entry" must adhere to the teachings of the '474 Patent and therefore requires that, at a minimum, "entry" be construed to include multiple data records.

GeoTag's proposed construction also fails to differentiate between "entries" and "data records," despite the use of these different terms within the same claims—*e.g.*, "wherein said entries comprise data records containing information about institutions or enterprises . . . ."[64]  Thus, GeoTag's construction would improperly eviscerate the key claim limitation of "entries," and remove any distinction between "entries" and "data records."[65]  Moreover, GeoTag's argument that claim differentiation supports its proposed construction because several dependent

---

[62]   *See id.* at 12:23-45 ("Any entry whose parent folder name matches the name specified will be returned by the search."); *see also id.* at 15:5-10 ("Thus, if the user wishes to search for a given topic . . . then only those entries . . . will be searched"); *id.* at 16:22-26.

[63]   *See, e.g.*, *id.* at Claim 1.

[64]   *Id.* at Claim 36; *see also id.* at Claim 18, 27.

[65]   *See Digital-Vending*, 672 F.3d at 1275 (noting the "well-established rule that 'claims are interpreted with an eye toward giving effect to all terms in the claim'"); *see also Cohesive Techs.*, 543 F.3d at 1368 (same); *Bicon*, 441 F.3d at 950 (same).

claims add the limitation that "entries comprise data records" wholly ignores the fact that this is *not* the sole limitation that is added in any of these dependent claims.[66]  In other words, none of the dependent claims state conclusively "… entries comprise data records [PERIOD]."  Instead, each of the dependent claims contains additional limitations concerning the term "data records."[67]  The doctrine of claim differentiation may not be used to broaden claims beyond their correct scope.[68]

Additionally, GeoTag's proposed construction of "entry" as "data contained in the database" impermissibly attempts to reclaim scope that the patentees disclaimed during patent prosecution.  After the claims of the '474 Patent application were rejected as obvious,[69] the patentees filed an Amendment that they asserted "clarified the patentability distinguishing features of the invention."[70]  In doing so, the patentees specifically narrowed the scope of every independent claim from *information* to *entries*, as exemplified in the amendment to Claim 1:

> a database of information organized into a hierarchy of geographical areas wherein **[the information]** entries corresponding to each one of said hierarchy of geographical areas is further organized into topics . . . .[71]

GeoTag's current "data in the database" construction is every bit as broad and general as the disclaimed *information*.  GeoTag may not—through claim construction or otherwise—recapture scope that was relinquished during prosecution of the '474 Patent to overcome the prior art:

---

[66]   Opening Brief at 10.

[67]   *See* '474 Patent at Dependent Claims 18, 19, 24, 25, 27, 29, 30, and 36; and *Kraft Foods, Inc. v. Int'l Trading Co.,* 203 F.3d 1362, 1368 (Fed. Cir. 2000) ("That the claims are presumed to differ in scope does not mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ.").

[68]   *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) ("[C]laim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history") (internal quotation marks omitted).

[69]   Exhibit D (2/10/98 Office Action at 3-13).

[70]   Exhibit H (8/10/98 Amendment and Response to Office Acton).

[71]   *Id.* at 2.

> The purpose of consulting the prosecution history in construing a claim is to "exclude any interpretation that was disclaimed during prosecution." Accordingly, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Such a use of the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers.[72]

Since the patentees amended each of the independent claims to require the dynamic replication of one or more *entries* from a broader geographical area into a narrower geographical area, the '474 Patent requires dynamic replication of a specific structure (namely, entries), and not of any type of unstructured "information" or any "piece of data contained in the database," as GeoTag proposes.[73]   Indeed, in the Interview Summary, the Examiner noted that the dynamic replication *of an entry* into a narrower geographical area would overcome the prior art of record.[74]   This Court should reject GeoTag's improper attempt to recover the broad scope it specifically surrendered and disclaimed during prosecution.

### 2.      Data Record(s).

GeoTag does not request a construction of the term "data record(s)," asking the Court instead to rely on an unarticulated "ordinary meaning."   However, ordinary meaning cannot be used for this term because, as set forth above, the '474 Patent uses the terms "entry" and "data record" to describe different things. The term "data record" is *ordinarily* defined to be identical to *record*.[75]   Because the ordinary meaning of "data record" is inconsistent with the use of that

---

[72]   *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal citations omitted).

[73]   *See* Section C below.

[74]   *See* Exhibit F (7/28/98 Summary of Examiner Interview); *see also Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 979 (Fed. Cir. 1999) ("The Examiner's Statement of Reasons for Allowance may help show that the applicant's own arguments during prosecution constitute a clear disavowal of claim scope.").

[75]   Computer Dictionary at 132, 399 (definition of data record: "see record"; definition of record: "a data structure that is a collection of fields…") (attached as Exhibit O).

term in the claims of the '474 Patent, the term must be construed.[76]

The specification explains that "records stored within a database format typically include one or more fields, wherein each field is given a name so that the field is independently accessible."[77]   The '474 Patent's claims, however, do not use the word *field* and instead consistently use the term "data records" to refer to this concept.[78]   Defendants' construction correctly captures the concept that "data records" are "fields within an entry," while addressing the inconsistency between the ordinary meaning of "data records" and the patentees' use of the term in the claims of '474 Patent.

GeoTag is incorrect when it argues that "[t]he specification distinguishes data records and fields because it states that *the data records* 'typically include one or more fields,' not that the data records are fields."[79]   In fact, the specification distinguishes between *records* and fields, and not between *data records* and fields.   As set forth above, the specification uses the terms "records" and "entries" synonymously.   The term "data records," however, is used only in the claims, and is not used synonymously with either "entry" or "record."

GeoTag further argues that Defendants' proposed construction is not supported because "a data record may contain any type of information, such as a namekey, a title, a label, a graphic image, a description, a URL Host name and a map" and is not limited to "information about institutions, such as phone number and address."[80]   But Defendants' construction of "one or more fields within an entry (*e.g.* phone number, address)" does not limit data records to phone numbers and addresses; these are simply two exemplary types of fields.   Even the portions of the

---

[76]   *See O2 Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

[77]   '474 patent at 27:3-6.

[78]   *See id.* at Claims 18, 19, 24, 25, 27, 29, 30 and 36.

[79]   Opening Brief at 24 (emphasis added).

[80]   *Id.* at 24-25.

specification cited by GeoTag show that the data records are the fields of an entry.[81]

In order to avoid any confusion and assist the jury in evaluating infringement and validity, it is critical that the terms "entry" and "data records" be construed clearly and consistently, as provided by Defendants' proposed constructions.

### C.    Dynamic Replication.[82]

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "dynamically replicated" and/or "dynamically replicating" (Claims 1, 20, and 31) | Automatically copying within the database at the time of a search rather than at a time established in advance. | Automatically copying or inheriting, at the time needed rather than at a time decided or established in advance. |
| "wherein within said hierarchy of geographic areas at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area." (Claim 1)

"wherein at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse" (Claim 20)

 "dynamically replicating an entry from broader geographical area into said geographical search area" (Claim 31) | Automatically copying at least one entry associated only with a broader geographical area within the database into at least one of the encompassed narrower geographical areas within the database at the time of a search rather than at a time established in advance.  (Claim 1)

Automatically copying at least one entry associated only with a larger geographical area within the database into at least one of the  encompassed smaller geographical areas within the database at the time of a search rather than at a time established in advance. (Claim 20)

Automatically copying an entry associated only with a broader geographical area within the database into the encompassed narrower geographical search | Wherein within the hierarchy of geographical areas, at the time needed rather than at a time decided or established in advance, at least a piece of data in a database associated with a broader geographical area is automatically copied or inherited into at least one narrower geographical area. (Claims 1 and 20)

Automatically copying or inheriting, at the time needed rather than at a time decided or established in advance, at least a piece of data contained in a database that is associated with a broader geographical area into an area from which topical information can be accessed that is a subset of |

---

[81]    *Id.* at 24-25 (citing '474 Patent at 18:60-65, 19:40-42, 46-50, 64-66; 20:7-8, 20:14-16, 20:28-29, 24:29-42, Fig. 13, Fig. 17, Tbl. 7.)

[82]    Exhibit P sets out the terms, proposed constructions, and a representative claim with the relevant terms highlighted.  GeoTag's Opening Brief discusses these terms on pages 11-15.

| | area within the database at the time of a search rather than at a time established in advance. (Claim 31) | that broader geographical area. (Claim 31) |
|---|---|---|

### 1.    "Dynamically Replicated" and/or "Dynamically Replicating."

As noted above, the phrases "dynamically replicated" or "dynamically replicating" do not appear in the '474 Patent specification.  Defendants' proposed constructions of these phrases are similar to those proposed by Magistrate Judge Everingham in the *Idearc* case but clarify those prior constructions in important respects.

First, Defendants' constructions clarify that dynamic replication occurs into a geographical area in the database.  This is clear from the claim language.  The relevant independent claims all contain the limitation of a database of information organized into a hierarchy of geographical areas (Claims 1 and 20) or a plurality of geographical areas (Claim 31).  The claims then expressly refer to these geographical areas when they require that entries that are associated only with a broader geographical area (or a geographical area of relatively larger expanse) in the database be dynamically replicated into another geographical area.[83]

Thus, given that the claims require that entries be dynamically replicated from one geographical area *in* the database into another geographical area *in* the database, dynamically replicating as claimed must occur *within the database*.  This is an important clarification.  In the *Idearc* case, Magistrate Judge Everingham expressly rejected Geomas' argument that the '474 Patent supported dynamic replication occurring in the displaying of search results, as opposed to occurring within the database.[84]  Specifically, Geomas argued that the '474 Patent's discussion

---

[83]    The other geographical area is a narrower geographical area in the database (Claim 1), a smaller geographical area in the database (Claim 20), or the geographical search area in the database (Claim 31).  *See* '474 Patent at Claim 1, 20, and 31; *see also id.* at 38:36-58, 39:41-61, 40:43-56.  Exhibit Q sets out these claims with the relevant phrases highlighted.

[84]    *Idearc* Markman Order at 23 (attached as Exhibit R).

of Figure 15 "describ[ing] the use of [reference fields 1305] *to generate the exemplary display* of Figure 15" disclosed dynamic replication.[85]   Figure 15 illustrates a display presented to a user accessing topic information for a particular geographical area selected in the geographic database.[86]   In finding that this portion of the specification did not support Geomas' construction, Magistrate Judge Everingham stated, "Figure 15 *displays* a list of related entries 1540 that is derived from the text previously stored within the label field 1315 of the data record" but "[t]here is *no replication or copying of any information* from a broader area into a narrower area at the time it is needed to respond to a search inquiry."[87]

Moreover, the facts that (i) the application claim, which became issued Claim 31, was rejected despite its specific claim limitation of displaying the topics; (ii) all pending claims that were directed at displaying information were rejected; and (iii) the display of data is still claimed separately (*e.g.*, Claims 22, 31, and 38) establish that dynamic replication does not occur through the display of information.   Instead, the claim language requiring that the geographical areas be in the database establishes that dynamic replication into those geographic areas must occur *within the database*.

Second, the claim language demonstrates that dynamic replication occurs "at the time of a search."   The parties in the *Idearc* case stipulated to the phrase "at the time needed rather than decided or established in advance," so this portion of the *Idearc* construction was not substantively addressed by Magistrate Judge Everingham.   In Claims 1 and 20, dynamic replication appears in the limitation concerning the search engine, and in Claim 31, the dynamic replication step occurs immediately after the search engine has been directed to select a

---

[85]   Geomas Opening Claim Construction Brief at 24 (citing '474 Patent, 22:28-38) (emphasis added) (attached as Exhibit S).

[86]   '474 Patent at Fig. 15, 5:22-24, 21:58-22:27.

[87]   Exhibit R (*Idearc* Markman Order) at 23 (emphasis added).

geographical search area.[88]

In addition, both Magistrate Judge Everingham and Geomas recognized that the dynamic replication occurs at the time of a search.  Indeed, Magistrate Judge Everingham rejected the description regarding Figure 15 as support for the claim term because "[t]here is no replication or copying of any information from a broader area into a narrower area *at the time it is needed to respond to a search inquiry*" in its description.[89]  In its own claim construction briefing, Geomas argued that dynamic replication "encompasses the reproducing, duplicating, repeating and/or including of data from broader geographical areas into narrower geographical areas by the search engine *at the time of a search*, rather than at a time decided in advance."[90]

GeoTag's proposed construction requiring that dynamic replication occur "at the time needed rather than at a time decided or established in advance" injects further ambiguity and indefiniteness into the claims because there is no guidance as to what the "time needed" actually is or how it would be determined.[91]  As is clear from the claim language and as recognized by Magistrate Judge Everingham and Geomas, dynamic replication must occur "at the time of a search."

Finally, Defendants propose that "dynamically replicating" be construed to mean "automatically copying" rather than "automatically copying or inheriting."  The Examiner confirmed, in her Interview Summary, that the inclusion of the "dynamic replication" phrase, would distinguish the claims over the prior art.[92]  The Examiner also stated that "dynamic

---

[88]   '474 Patent at 38:36-58, 39:41-61, 40:43-56.

[89]   Exhibit R (*Idearc* Markman Order) at 23 (emphasis added).

[90]   Exhibit S (Geomas Opening Claim Construction Brief) at 5, 9, and 25.

[91]   *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F. 3d 1342, 1350 (Fed. Cir. 2005) (holding that "[s]ome objective standard must be provided in order to allow the public to determine the scope of the claimed invention" or the claim is indefinite).

[92]   Exhibit F (7/28/98 Summary of Examiner Interview).

replication" had synonyms.[93]

Synonyms: dynamic replication = automatic inheritance = parent - child = inheriting attributes

The patentees never disagreed with the Examiner's statements.  Dynamically replicating an entry from a broader geographical area into a narrower geographical area within the database has the same meaning as "automatically inheriting" and as "inheriting attributes" (that is inheriting "an entry" from a "parent" geographical area into a "child" geographical area in the database). This therefore has the same meaning as replicating, that is copying, an entry from a broader parent geographical area into a narrower child geographical area in the database.

Since the meanings are identical, and since "copying" is simpler for the fact finder to understand and accurately reflects the definition of "replicating," Defendants' construction uses "automatically copying."  And although, as GeoTag notes, the words "automatically inherited" are used in the specification,[94] this language actually describes the way that data is stored in the geography database and is unrelated to dynamic replication.[95]

Accordingly, the Court should construe "dynamically replicated" and "dynamically replicating" as "automatically copying within the database at the time of a search rather than at a time established in advance."[96]

---

[93]   Exhibit G (12/9/98 Search Request Form).

[94]   '474 Patent at 18:60-19:63.  *See also* Geomas Reply Claim Construction Brief at 10 (referring to "automatic inheritance" and "dynamic replication" as "distinct" concepts and equating "automatic inheritance" and its related specification discussion to "data organization": "'[T]his process of automatically inheriting fields from a parent entry into a child entry' is <u>not</u> the same as the dynamic replication process, but rather relates to data entry.") (attached as Exhibit T).

[95]   In the context of the invention, Defendants' construction of the larger dynamic replication phrases as discussed below, which requires copying from a larger/broader geographic area into an *encompassed* smaller/narrower geographic area, has the same meaning as inheriting.

[96]   While defendants have proposed a construction for the dynamically-replicated limitations, defendants do not thereby waive their argument that any claim incorporating that limitation is invalid under 35 U.S.C. § 112. Dynamic replication must occur in conjunction with the search, and the specification fails to disclose anywhere that the inventors were in possession of this concept.

### 2.      The Larger "Dynamic Replication" Phrases.

Each of the asserted independent claims also contains a larger dynamic replication phrase

describing what information is dynamically replicated, where the information is replicated from,

and where the information is replicated into.  Each of the larger "dynamic replication" phrases is

reproduced below:

- "*within said hierarchy of geographical areas* at least one of said entries associated with a broader geographical area is dynamically replicated into at least one narrower geographical area" (Claim 1);

- "at least one of said entries in *said geographical area of relatively larger expanse* is dynamically replicated into at least one of *said geographical areas of smaller expanse*" (Claim 20); and

- "dynamically replicating an entry from broader geographical area into *said geographical search area*" (Claim 31).[97]

Defendants' proposed construction for each of the larger "dynamic replication" phrases

incorporates the notion that the dynamic replication takes place within the claimed database, and

that the recited "broader geographical area/area of relatively larger expanse" and "narrower

geographical area/geographical search area" are also within the database.  The plain reading of

the claim language supports Defendants' proposed constructions.  For example, Claim 20 recites:

> 20.    A machine for locating information organized into geographically-based areas, said machine comprising:
>
> a database of information accessible by a computer, *said database of information organized into a predetermine[d] hierarchy of geographical areas comprising at least a geographical area of relatively smaller expanse and a geographical area of relatively larger expanse*, said area of larger expanse including a plurality of areas of smaller expanse and wherein entries corresponding to each of said hierarchy of geographical area is further organized into topics; and
>
> a search engine executing in a computer and in communication with said database, said search engine configured to select at least one geographical area in

---

[97] As with the "dynamically replicating" phrases, there is no written description in the '474 patent supporting the larger dynamic replication phrases.  Thus, regardless of how the Court construes these phrases, the claims are invalid.

said hierarchy of geographical areas so as to define a geographical search area wherein **at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse**, said search engine further configured to search said topics within said geographical search area.[98]

The portions of the "dynamic replication" phrases that recite "one of said entries in said geographical area of relatively larger expanse" and "one of said geographical areas of smaller expanse" (in bold above) find their antecedent basis in the above italicized portion of the database term.  Thus, according to the plain language of the claim, the recited "larger" and "smaller" geographical areas are within the database, and the dynamic replication likewise occurs within the database.  In similar fashion, the dynamic replication phrases in Claims 1 and 31 rely on antecedent basis in their database terms, as reflected in the highlighted phrases in these claims in Exhibit Q.[99]  GeoTag's proposed construction also supports the position that dynamic replication takes place within the database.  According to GeoTag, the dynamic replication is from "a broader geographical area into an area from which topical information can be accessed that is a subset of that broader geographical area."[100]  By acknowledging that the copying is "into an area from which topical information can be accessed," GeoTag admits that the replication takes place into the selected search area within the database.

Defendants' proposed constructions also clarify that the entry that is dynamically replicated is only associated with the claimed broader geographical area.  Indeed, GeoTag's Technology Tutorial contains admissions that support Defendants' proposed construction.  In

---

[98]  '474 Patent at Claim 20 (emphasis added); *see also* Exhibit Q.

[99]  The dynamic replication phrase of claim 1 recites "*within said hierarchy of geographical areas* . . . a broader geographical area is dynamically replicated into . . . at least one narrower geographical area" and finds its antecedent basis in Claim 1's database term reciting "a database of information organized into a hierarchy of geographical areas . . . ."  The "said geographical search area" recited in Claim 31 also finds its antecedent basis in the database term because the claim also recites "directing a search engine executing in a computer to select one or more of said geographical areas so as to select a geographical search area."

[100]  Opening Brief at 14.

slides 81-85 of its Technology Tutorial, GeoTag explains the rationale for associating entries with only a broader geographic area—namely so that the particular entry can be replicated into any narrower geographic search area that would be encompassed by the broader area.[101] GeoTag's briefing also admits that dynamic replication is always from a higher level to a lower level.[102]   Indeed, it would make no sense to dynamically replicate an entry associated with a narrower area at a low level into another narrower area at the same low level.

Defendants' proposed constructions also provide that the area into which the entry is replicated is a narrower geographic area that is encompassed by the broader area.[103]   GeoTag incorrectly argues that Defendants are trying to limit the database to a hierarchical database by proposing that the area into which an entry is dynamically replicated is encompassed by the broader area, and that Magistrate Judge Everingham already rejected this concept.[104]  Nothing in Defendants' construction of these terms suggests that the database has to be hierarchical.  To the contrary, the notion that the narrower/smaller areas are encompassed by the broader/larger areas is consistent with the prosecution history and the specification.  In allowing the claims of the '474 Patent, the Examiner noted that the dynamic replication of an entry into a narrow geographical area would overcome the prior art of record.[105]   The Examiner also noted that dynamic replication had synonyms.[106]  One of the synonyms[107] noted by the Examiner, "parent-

---

[101]   Exhibit K (GeoTag Technology Tutorial) at Slides 83-84; *see also* Exhibit L (GeoTag Technology Tutorial Transcript) at Slides 81-85.

[102]   Opening Brief at. 3-4; *see also* Delaware Joint Claim Construction Brief at 2-3 (attached as Exhibit U).

[103]   Magistrate Judge Everingham's prior constructions differentiated between Claims 1 and 20, and Claim 31, noting that the dynamic replication was into "a narrower geographic area" for Claims 1 and 20, and into an "area from which topical information can be accessed that is a subset of that broader geographical area" for Claim 31. Defendants' proposed constructions construe Claims 1, 20 and 31 consistently therewith.

[104]   Opening Brief at 14.

[105]   Exhibit F (7/28/98 Summary of Examiner Interview).

[106]   Exhibit G (12/9/98 Search Request Form) ("Synonyms:  dynamic replication = automatic inheritance = parent-child = inheriting attribute."); *see also* Section II.C.1 above.

child," is further explained by the specification, and supports the notion that narrower areas are encompassed by broader ones:

> As used herein, a "parent" entry is an entry (e.g., geographic or topical) which encompasses one or more children entries within the geographic or topical hierarchy, and a child entry is an entry which is encompassed by a parent entry within the geographical or topical hierarchy.[108]

Lastly, both GeoTag's Opening Brief and its Technology Tutorial show that replication is into an encompassed area. Every reference to dynamic replication in GeoTag's Opening Brief and Technology Tutorial show replication from a broader area into an encompassed narrower area.[109]

GeoTag's proposed constructions of these larger phrases are also incorrect because they misconstrue the items that are being dynamically replicated. Each of the independent claims (and therefore all of the claims) requires the dynamic replication be of "an entry" or "at least one entry." GeoTag's proposed constructions allow for the dynamic replication of any "piece of data contained in a database," regardless of whether it is an entry or not. GeoTag's proposed constructions should be rejected for this additional reason. For the reasons stated above, the larger dynamic replication phrases should be construed as proposed by Defendants.

---

[107]   The other synonyms noted by the Examiner are also consistent with Defendants' proposed construction. Defendants' construction requires copying from a broader area into an encompassed narrower area, which is consistent with "inheriting attributes" and "automatically inheriting."

[108]   '474 Patent at 12:28-33.

[109]   Opening Brief at 3-4; *see also* Exhibit U (Delaware Joint Claim Construction Brief) at 2-3 and Exhibit L (GeoTag Technology Tutorial Transcript) at Slides 81-85.

### 3.     Area of Narrower-Smaller Expanse vs. Broader-Larger Expanse.[110]

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "narrower geographical area" (Claim 1)<br><br>"geographical area of relatively smaller expanse" (Claim 20) | A geographic area within the database encompassed by a broader geographic area within the database. | No need to construe.   Plain and ordinary meaning. |
| "broader geographical area" (Claims 1 and 31)<br><br>"geographical area of relatively larger expanse" (Claim 20) | A geographic area within the database that encompasses one or more narrower geographic areas within the database. | No need to construe.   Plain and ordinary meaning. |

Each of these phrases is interrelated to the geographical hierarchy and dynamic replication terms, and should be construed consistently with those.  As discussed below regarding the geographical hierarchy terms, the claim language and the specification require that broader geographic areas encompass narrow geographic areas in the database, and vice versa. Likewise, as discussed above, the dynamic replication amongst these areas occurs within the database.  GeoTag, however, incorrectly states that "the terms 'broader geographical area' and 'narrower geographical area' are not 'geographical areas within the database.'"[111]  GeoTag's statement is contradicted by the plain language of Claims 1, 20, and 31.[112]

Accordingly, Defendants incorporate their analysis of the geographical hierarchy and dynamic replication terms for these four related terms, which makes clear that GeoTag's attempts to remove these areas from "within the database" and from the "hierarchy of geographic areas" contradicts both the specification and claims, and thus should be rejected.

---

[110]   Exhibit V sets out the terms, proposed constructions, and representative claims with the relevant terms highlighted.  GeoTag's Opening Brief discusses these terms on pages 27-29.

[111]   Opening Brief at 28.

[112]   *See* Exhibit Q (Highlighted portions of Claim 1, 20, and 31).

### D.    Geographic or Hierarchical Terms.

Defendants propose constructions for a number of geographical or hierarchical terms found in the asserted claims of the '474 Patent:

### 1.    Geographical Hierarchies.[113, 114]

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "hierarchy of geographical areas" (Claims 1 and 20) | Related geographical areas, ordered such that broader geographic areas encompass narrower geographic areas. | An arrangement of related information or data, ordered from broader general categories to narrower specific ones. |
| "database of information organized into a hierarchy of geographical areas" (Claim 1)<br><br>"database of information organized into a predetermined hierarchy of geographical areas" (Claim 20)<br><br> "wherein said geographical areas are hierarchically organized" (Claim 32) | Entries are ordered into geographic areas within the database, such that a broader geographic area encompasses narrower geographic areas. | A collection of interrelated information or data organized such that a computer program can quickly retrieve selected information or data, ordered from broader geographical categories to narrower geographical categories. (Claim 1)<br><br>A collection of interrelated information or data organized such that a computer program can quickly retrieve selected information or data, ordered from broader geographical categories to narrower geographical categories that are decided or established in advance.  (Claim 20)<br><br>An arrangement of related information or data, ordered from broader general categories to narrower specific ones. (Claim 32) |

---

[113]   Exhibit W sets out the terms, proposed constructions, and a representative claim with the relevant terms highlighted.  GeoTag's Opening Brief discusses these terms on pages 7-9 and 16-17.

[114]   GeoTag has proposed separate constructions for the terms "hierarchy" and "hierarchically organized," but Defendants contend that these terms do not need to be construed separately since their constructions are inherent in the constructions of the broader phrases being construed (e.g., "hierarchy of geographical areas").

The '474 Patent requires that the "hierarchy of geographic areas" be ordered such that larger geographic areas contain smaller geographic areas—this is the focus of Defendants' proposed constructions.  Specifically, the hierarchy described in the '474 Patent descends from broader geographical areas to narrower geographical areas that are encompassed within the broader areas, such as from all states "within each country" to all regions "within a state" to all cities "within a region."[115]

The claim language and the specification teach a hierarchy of geographical areas wherein broader geographic areas encompass narrower geographic areas.  Claim terms must always be construed consistently with the plain language of the claim.[116]  Further, "[t]he specification 'is the single best guide to the meaning of a disputed term' and it 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'"[117]  Both the claim language and the specification support Defendants' constructions and not GeoTag's.

The claim language requires a database containing information "organized into a hierarchy of geographical areas."[118]  Contrary to GeoTag's argument, Defendants *do not* contend that the database must be structured as a "hierarchical database."  Certainly, a "hierarchical database" would fulfill the claim's requirement of a "hierarchy of geographical areas," but the claim language does not require this structure.  Whatever the database structure may be, the claims require that the information within the database must be organized into a hierarchy of geographical areas.  The claims define the hierarchy of geographical areas to include entries for broader and narrower geographic areas.  Specifically, in Independent Claims 1 and 26, the

---

[115]   '474 Patent at 8:64-8:67.

[116]   *Phillips*, 415 F.3d at 1312-13; *Apple, Inc. v. Samsung Elec. Co.*, No. 2012-1507, 2012 WL 4820601, at *7 (Fed. Cir. Oct. 11, 2012) (attached as Exhibit X).

[117]   *Phillips*, 415 F.3d at 1321 (Fed. Cir. 2005) (quoting *Vitronics*, 90 F.3d at 1582).

[118]   *See, e.g.*, '474 Patent at Claim 1 (reciting "a database of information organized into a hierarchy of geographical areas").

database entries from a "broader geographical area" are dynamically replicated into a "narrower geographical area."[119] The claims therefore require that a broader geographical area in the database encompass a "narrower geographic area" or the "geographical area of relatively smaller expanse," as phrased in certain claims.[120]

The specification further details the hierarchy required by the claim language: "the hierarchy has a structure comprising plural geographical levels into which the geographical areas are geographically categorized by size to provide a low level, one or more intermediate levels and a high level.  Each of the geographical levels above the lowest level *encompasses* a plurality of lower level geographical areas."[121]

The specification elaborates on how the higher levels encompass the lower levels, stating "a 'parent' entry is an entry (*e.g*., geographic or topical) which encompasses one or more children entries within the geographic or topical hierarchy, and a 'child' entry is an entry which is encompassed by a parent entry within the geographical or topical hierarchy."[122]   Thus the broader geographical area (*i.e*., the 'parent') must encompass at least one narrower geographical area (*i.e*., the 'child').[123]   Similarly, the narrower geographical area must be "encompassed by a broader geographic area."[124]

GeoTag attempts to evade the '474 Patent's description of entries encompassing one another within the hierarchy of geographical areas by citing use of the word "encompass" in

---

[119]   *Id.* at Claims 1 and 26.  Independent claim 20 illustrates the same concept but uses different terminology.  *Id.* at Claim 20 (requiring "at least one of said entries in said geographical area of relatively larger expanse is dynamically replicated into at least one of said geographical areas of smaller expanse").

[120]   *Id.* at Claims 1 and 26.

[121]   *Id.* at 3:18–25 (emphasis added); *see also id.* at 3:46–56.

[122]   *Id.* at 12:28–33.

[123]   See Dictionary of Computing (Prentice Hall 1992) ("[a] hierarchical system (if managed properly) permits 'child' records to be logically related to the 'parent' record, ensuring that child records do not have existence of their own; they only have meaning when associated with a parent.") (attached as Exhibit Y).

[124]   *Id.* at 8:59–9:4; Figs. 2A and 13; Tbl. 7 at 31:60.

Dependent Claim 5.   Claim differentiation, however, does not apply because Claim 5 adds multiple limitations unrelated to the meaning of "hierarchy of geographical areas."  For example, claim 5 requires at least a three-level hierarchy descending from "a high level" to "one or more intermediate levels" to "a low level."[125]  Claim 1, by contrast, allows a two-level hierarchy that includes only a "broader geographical area" and a "narrower geographical area."[126]  Because of these additional limitations, Claims 1 and 5 are presumed to have different scope, but Claim 5 does nothing to contradict Defendants' proposed construction that broader geographic areas encompass narrower geographic areas.

Likewise, contrary to GeoTag's assertion, the presence of "predetermined" in Claim 20 or "predefined" in Claim 26 has no impact on Defendants' proposal.  As noted in Magistrate Judge Everingham's Claim Construction Order, the *Idearc* parties defined these terms to mean "decided or established in advance."[127]  In the context of Claims 1 and 20, these terms merely require that the hierarchy be determined before the data is entered into the database.  But when the hierarchy of geographical areas is defined has no bearing on whether broader geographic areas encompass narrower geographic areas within that hierarchy.

Therefore, both the claim language and the specification support Defendants' constructions of the "geographical hierarchy" terms.

---

[125]   *Id.* at Claim 5.
[126]   *Id.* at Claim 1.
[127]   Exhibit R (*Idearc* Markman Order) at n.8.

2.      **Search Area.**[128]

| Term | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "geographical search area" (Claims 1, 20, and 31) | The particular geographical area within the database selected by the search engine whose entries are to be searched. | The particular selected geographical area for which the associated data records in the database are to be searched. |

Defendants' proposed construction clarifies the meaning of the claims and properly remains true to both the claim language and the specification by properly identifying (i) where the geographical search area is located ("within the database"), (ii) what selects the area ("the search engine"), and (iii) what is searched in the area ("entries").    GeoTag's proposed construction, by contrast, creates ambiguity and improperly ignores the intrinsic evidence.

First, although left undefined by GeoTag's construction, the '474 Patent makes clear that the claimed geographical search area is located "within the database" and is selected "by the search engine."    Independent Claim 1, for example, requires "a database of information organized into a hierarchy of geographical areas" and a "search engine further configured to select one of said hierarchy of geographical areas . . . so as to provide a geographical search area."[129]    Independent Claims 20 and 31 contain similar limitations.[130]    The only plausible interpretation of the claim language is that the geographical search area is selected *by the search engine* from among a group of geographical areas within the database, and therefore the selected geographic search area is also located *within the database*.    Although GeoTag's proposed construction includes the phrase "in the database," it is unclear whether the geographical search

---

[128]   Exhibit Z sets out the term, proposed constructions, and a representative claim with the relevant search terms highlighted.  GeoTag's Opening Brief discusses this term on pages 13-14.

[129]   '474 Patent at 38:44-53.

[130]   *See, e.g., id.* at 40:45-52 (reciting "organizing a database of on-line information into a plurality of geographical areas" and "directing a search engine . . . to select one or more of said geographical areas so as to select a geographical search area").

area is contained in the database, or only "associated data records."  Because GeoTag's proposal injects ambiguity into otherwise clear claim language, it should be rejected.

GeoTag's proposed construction also fails because it misconstrues what is searched in the geographical search area.  Once again, the claim language itself defines the proper scope of this limitation by disclosing that structured "entries" in the database make up the geographical search area, not merely their "associated data records" as GeoTag contends.  For instance, the phrase "associated data records" does not appear in the independent claims; instead, those claims are replete with references to "entries" that correspond to geographical areas.[131]  Indeed, the only reference to "data records" occurs in dependent claims that define specific types of data records within an "entry."[132]  Under the doctrine of claim differentiation, "data records" are presumed distinguishable from "entries,"[133] and therefore "data records" should not be substituted for "entries" in the construction of this term.[134]

Finally, Defendants' construction is consistent with the specification.  For example, the specification describes the use of namekey fields to define geographical areas in the geographic database.[135]  Using those namekeys, the Dbview parameter defines the particular geographical area within the database whose entries are to be searched:

> The Dbview parameter specifies the "view" to use when searching and displaying a set of list entries. A view is defined as the geographic perspective from which the user wishes to conduct a given search. Thus, if a user wishes to search for a given file

---

[131]  *See, e.g.*, *id.* at 38:45-55 (claiming "entries corresponding to each one of said hierarchy of geographical areas" and "entries associated with a broader geographical area"); 40:45-54 (claiming "geographical areas having a plurality of entries associated therewith," "entries corresponding to said plurality of geographical areas," and "an entry from broader geographical area").

[132]  *See, e.g.*, *id.* at 39:34-35 (reciting "wherein said entries comprises a plurality of data records").

[133]  *See Phillips*, 415 F.3d at 1315.

[134]  *See also* Section II.B.

[135]  *See, e.g.*, '474 Patent at 19:2-6 ("That is, the namekey character string which designates a particular city is constructed from the namekey of the continent, country, state, and region namekeys for the continent, country, state, and region in which the city is located.").

(specified by the Name Key parameter), then only those files *within the subdivision of the geographic database* 210 defined by Dbview will be searched. For example, if the parameter Dbview is specified as "city," this will cause the search engine to search those records having the designated folder name beneath the city level of the geographic hierarchy so that only points of interest having the given folder name will be searched.[136]

Because Defendants' proposed construction is consistent with the claim language and specification, the Court should adopt Defendants' proposal.

### 3. Organizing a Database . . . into a Plurality of Geographic Areas.[137]

| Term | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "organizing a database of on-line information into a plurality of geographical areas" (Claim 31) | At the time the database is being organized, ordering entries of on-line information into geographic areas within the database. | Organizing a collection of information that is capable of being accessed by a computer into more than one geographical area |

Defendants' proposed construction is founded on the same support in the claims and specification as the proposed construction for "database of information organized into a hierarchy of geographic areas" in Section II.D.1 above, but also clarifies that entries must be ordered into geographic areas within the database *at the time the database is being organized*. This potential temporal ambiguity arises based on differences in grammatical structure in the claims (*i.e.*, "organizing" rather than "organized"). However, the '474 Patent makes clear that a geographically organized database is the basic foundation for the remaining claim limitations, and that the required geographic ordering must occur within the database when the database is being organized and not at the time of a later search request.

Defendants' proposed construction finds support in the specification and resolves any

---

[136]   *Id.* at 11:53-64 (emphasis added).

[137]   Exhibit AA sets out the term, proposed constructions, and a representative claim with the relevant term highlighted. GeoTag's Opening Brief discusses this term on page 18.

perceived temporal ambiguity.  For example, as stated above, the specification describes the use of namekey fields to define geographical areas in the geographic database.[138]  These namekeys are assigned when the database is being organized, such that entries are ordered into geographic areas within the database for subsequent searching by the search engine using the Dbview parameter.[139]  Likewise, "organizing a database" requires that entries be ordered within the database at the time the database is being organized, not while a search is run.  Therefore, Defendants' construction is in accordance with the specification and should be adopted.

E.    Database.[140]

| Term | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|------|-----------------------------------|--------------------------------|
| "database" (Claims 1, 20, and 31) | A data structure of ordered entries separate from the user's browser that is accessed by the search engine to search geographically and topically. | Collection of information or data organized such that a computer program can quickly retrieve selected information or data. |

The primary disputes between the Parties' proposed constructions are as follows: (i) whether "database" can be construed to include data resident in the user's Internet browser; and (ii) whether the database must comprise a "data structure of ordered entries" rather than, as alleged by GeoTag, a simple "collection of information or data."

1.    The "Database" Is Separate from the User's Browser.

Defendants' proposed construction—which specifies that the database is separate from the user's browser—is the only proper construction based on the intrinsic evidence.  The point of the invention of the '474 Patent was to provide the available search engines of the mid-1990's a new database structure to search in order to provide more efficient searching of the Internet for

---

[138]   *See, e.g.*, '474 Patent at 19:2-6.

[139]   *See, e.g.*, *id.* at 11:53-64.

[140]   Exhibit BB sets out the term, proposed constructions, and a representative claim with the relevant term highlighted.  GeoTag's Opening Brief discusses this term on pages 9-10.

geographical and topical information.[141]   In every instance, the Figures of the '474 Patent show the user's browser as a distinct and separate element from the databases with the remote databases only accessible once the user's browser connects to the Internet.[142]   Similarly, the specification demonstrates that the database is remote from the user's browser.[143]

Likewise, the patentees' election to proceed with claims directed to the remote database further demonstrates that "database" cannot be construed to include data on the user's browser. At the outset of the prosecution of the '474 Patent, the Examiner determined that the patentees included two distinct set of claims: one set defined by the Examiner to be a "*search engine for remotely accessing data from a database* where the data is arranged geographically and topically"; and a separate set directed to a "display composer that generates a display page."[144] The patentees elected to proceed with the first set of claims, directed to the remote database.  The "remotely accessing" language confirms that the database is separate and "remote" from the user's computer.

2.    **The Database Must Comprise a "Data Structure with Ordered Entries."**

Similarly, the database of the '474 Patent—indeed any database—must include some type of "data structure" rather than an unstructured set of data.[145]   The claims themselves require

---

[141]  '474 Patent at 2:20-33.

[142]  *See, e.g., id.* at Figs. 3 and 8 (geography database), and Figs. 5-8 (Yellow Pages databases).

[143]  *See, e.g., id.* at 3:34-36 ("The user computer is configured to display remotely accessible information.  The system further comprises a database which stores remotely accessible information and a plurality of display formats."); 10:42-58; 18:10-22.

[144]  Exhibit B (11/25/97 Office Action) at 2 (emphasis added).

[145]  Defendants do not believe that reliance on extrinsic evidence is necessary.  However, even the extrinsic evidence relied on by GeoTag supports the conclusion that a database must have a "data structure."  *See, e.g.,* GeoTag's Preliminary Claim Constructions And Extrinsic Evidence Pursuant To Local Patent Rule 4-2 at 29 ("IBM Dictionary of Computing (1994) at 165 ('database' means ('(1) A collection of *data with a given structure* for accepting, storing, and providing, on demand, data for multiple users.')" (emphasis added)) (attached as Exhibit CC).  Moreover, the requirement that a database must have "a data structure" is further supported by the Dictionary of Computing.  *See* Exhibit Y (Dictionary of Computing (Prentice Hall 1992))

---

that the data be structured, or organized, at least into geographic areas.[146]  In addition, as discussed above, the entire point of the '474 Patent was to provide a database structured with information arranged into a hierarchy of geographical information.

GeoTag's proposed construction ignores these realities of databases in general, and is not supported by the intrinsic evidence of the '474 Patent.  GeoTag instead relies on the prior construction from the *Idearc* litigation without providing any support for its construction.  However, as discussed above at Section I.C, this Court is neither bound by the prior construction, nor should the Court give it weight where the disputed issues that the Parties present here were not presented in the prior litigation.

Finally, GeoTag's proposed construction includes the concept that "a computer program can quickly retrieve selected information or data."  This language does not simplify the issues for resolution by the fact-finder.  For instance, under GeoTag's construction, how does the fact-finder determine whether the information is "quickly" retrieved and which "computer program" does the retrieving?[147]  Accordingly, the Court should not adopt GeoTag's proposed construction.

## F.    On-line Information and Organizer.[148]

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "on-line information" (Claims 1 and 31) | Information that is remotely accessible over a network. | Information capable of being accessed by a computer. |

---

('database' means "a data structure for accepting, storing and providing on demand data for multiple independent users.").

[146]  '474 Patent at Claim 1 ("a database of information organized into a hierarchy of geographical areas").

[147]  Each of the independent claims of the '474 Patent requires the "search engine" to communicate or otherwise retrieve the information.  Accordingly, GeoTag's proposed construction adds ambiguity rather than clarity for the fact-finder.

[148]  Exhibit DD sets out the terms, proposed constructions, and representative claims with the relevant terms highlighted.  GeoTag's Opening Brief discusses this term on pages 17-18 and 21-22.

| Terms | Defendants' Proposed Construction | GeoTag's Proposed Construction |
|---|---|---|
| "organizer" (Claim 1) | A network interface (comprising a database and a search engine) that organizes 'on-line information' into categorized listings to make finding information easier. | Software, hardware, and/or firmware, that alone or in combination is configured to receive search requests, together with a database and a search engine in communication with the database. |

### 1.    On-Line Information.

The Parties' dispute centers on whether "on-line information" must be remotely accessible as Defendants contend.  GeoTag's construction (*i.e.*, "information capable of being accessed by a computer") essentially reads out the "on-line" limitation of the claim, and reduces the term to "information" in its most general sense—encompassing data on a standalone computer that is isolated from all networks, or even on a second unrelated computer.  This is contrary to the clear teachings of the '474 Patent's specification and standard dictionary definitions of "on-line."

Information that is "on-line" is repeatedly referred to in the specification as being remotely accessible.[149]    And the prototypical "on-line" service to facilitate such remote accessibility of information is identified as the "Worldwide Web":  "One popular computer on-line service is the Worldwide Web (WWW) which constitutes a subnetwork of on-line documents within the Internet."[150]

---

[149]    *See, e.g.*, '474 Patent at 3:31-33 ("Under one aspect, the invention comprises a system for composing the display format of *remotely accessible* information in an on-line network" (emphasis added)); *id.* at 1:13-19 ("On-line computer services, *such as the Internet*, have grown immensely in popularity over the last decade. Typically, such an on-line computer service provides access to a hierarchically structured database where information within the database is *accessible at a plurality of computer servers which are in communication via conventional telephone lines or T1 links, and a network backbone*." (emphasis added)).

[150]    *Id.* at 1:66 - 2:1; *see also*, *id.* at 5:66 - 6:14 (describing the Internet as depicted in Fig. 1 as "an on-line computer service" that comprises "a plurality of geographically distributed servers, interconnected by a high-speed data backbone").

Aside from the intrinsic evidence, GeoTag's own cited extrinsic dictionary definition for "on-line" supports Defendants' construction, not GeoTag's: Webster's II New College Dictionary (1995) defines "on-line" as "[c]onnected to a computer network" or "[a]ccessible by means of a computer or computer network."[151] GeoTag improperly disregards its own dictionary definition's reference to "networks" and the remote accessibility of information thereon. This dictionary definition is wholly consistent with Defendants' proposed construction, and only supports GeoTag's if the word "network" is ignored, which would be improper.

In short, there is no intrinsic or extrinsic support for GeoTag's construction of "on-line information," which disregards the rudimentary aspect of remote accessibility. According to GeoTag, any information, such as that stored in a database or a simple Microsoft Word document, is "on-line" if it can be accessed by the computer it is saved on. Such an overly broad construction cannot be proper for this commonly understood term. Therefore, as demonstrated above by both intrinsic and extrinsic evidence, the Court should adopt Defendants' construction.

## 2. Organizer.

The Parties dispute whether the term "organizer" has an understood meaning in the context of the '474 Patent. GeoTag's construction (*i.e.*, "software, hardware, and/or firmware, that alone or in combination is configured to receive search requests, together with a database and a search engine in communication with the database") simply repeats other claim language and improperly reduces the term "organizer" to a "thing" that somehow just receives search terms.[152]

But "organizer" is not described in the '474 Patent as a generic device akin to "system"

---

[151] Exhibit CC (GeoTag's Preliminary Claim Constructions And Extrinsic Evidence Pursuant To Local Patent Rule 4-2) at 30 (citing Webster's II New College Dictionary (1995) at 765).

[152] *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) (a claim term only "defined 'by what it does rather than what it is'" is indefinite (quoting *In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971))).

or "machine" (as used in Claims 20 and 26 respectively).  Rather, the term refers to a type of special purpose software application or system that was known in the art at the time of the alleged invention.[153]  These "organizers" are described as network interfaces that do something specific—as the term implies they *organize* "on-line information."[154]  Defendants' construction comports with those descriptions.

The prosecution history provides additional support for Defendants' position.  According to the Examiner, the prior art disclosed the "organizer" limitation because "the Yahoo *directory* is an organizer as in table of contents of Web sites, pg. 183."[155]  And the prior art cited during prosecution defines such "directories" in a manner consistent with the specification's discussion of "organizers":

> What do we mean by directory?  Directories generally provide an editorial service – they determine the best sites around the Web and include them in categorized listings to make finding information easier.   Some directories actually combine two features – a directory of categorized sites and a search engine for searching both the category listing and the Internet.[156]

The patentees never disputed the Examiner's interpretation of the "organizer" term, and the claims were only allowed following the addition of the "dynamic replication" limitation,[157] further supporting Defendants' proposed construction.[158]

---

[153]  *See* '474 Patent at 2:24-26 ("the organization of information accessible through *current* Internet browsers and *organizers* …" (emphasis added)); *id.* at 2:30-32 ("In addition, *present Internet organizers* do not effectively integrate the topical and geographically based information in a consistent manner." (emphasis added)).

[154]  *See, e.g.*, *id.* at 7:5-11 ("In accordance with the teachings of the preferred embodiment, the *web organizer server* 114 … provides subscribing users with a geographically organized perspective of the information available by accessing the Internet.") (emphasis added); *id.* at 1:6-10 ("The present invention relates to network interfaces which act to organize information accessible on the network and, in particular, to an Internet browser interface which acts to organize information available on the Internet based upon geographical distribution.").

[155]  Exhibit D (2/10/98 Office Action) at 2 (emphasis added).

[156]  Exhibit E (Using Netscape) at 185.

[157]  *See* Exhibit F (7/28/98 Summary of Examiner Interview).

[158]  *See, e.g.*, *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (instructing that the district court could look to prior art considered during prosecution to understand the meaning of a disputed term because "[a]fter all, the prior art is often a reliable source of the understanding of one of ordinary skill in

GeoTag's construction is no construction at all; rather, it is an unhelpful reshuffling of the surrounding claim language.  It improperly defines the term "organizer" as any generic apparatus that receives search queries.  Defendants' construction of the "organizer" term, which is supported by (i) the specification, (ii) cited prior art, and (iii) Examiner statements associating the term with the cited prior art, should be adopted by this Court

### G.    Remaining Terms.

GeoTag has identified additional terms and proposed related constructions.  Given the terms and proposed constructions discussed in detail above, however, Defendants contend that GeoTag's additional terms either (i) do not need to be separately construed in view of Defendants' proposed constructions or (ii) should be given their plain and ordinary meaning.

---

the art"); *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999) ("Prior art references may be 'indicative of what all those skilled in the art generally believe a certain term means ... [and] can often help to demonstrate how a disputed term is used by those skilled in the art.'") (citing *Vitronics*, 90 F.3d at 1584).  *Cf. St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 F. App'x 270, 276 (Fed. Cir. 2011) ("Because an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight.").

Dated: December 11, 2012                    Respectfully submitted,

                                            */s/ Mark T. Garrett on behalf of*
                                            *Willem G. Schuurman (Lead Defendant)*

                                            Mark T. Garrett
                                            State Bar No. 24007225
                                            FULBRIGHT & JAWORSKI LLP
                                            98 San Jacinto Blvd., Suite 1100
                                            Austin, TX 78701
                                            Tel: 512.474.5201
                                            Fax: 512.536.4598
                                            mgarrett@fulbright.com

                                            Charles S. Baker
                                            State Bar No. 01566200
                                            FULBRIGHT & JAWORSKI LLP
                                            1301 McKinney, Suite 5100
                                            Houston, TX 77010-3095
                                            Tel: 713.651.5151
                                            Fax: 713.651.5246
                                            csbaker@fulbright.com

                                            Brandy S. Nolan
                                            State Bar No. 24070337
                                            FULBRIGHT & JAWORSKI LLP
                                            2200 Ross Avenue, Suite 2800
                                            Dallas, TX 75201
                                            Tel: 214.855.8000
                                            Fax: 214.855.8200
                                            bnolan@fulbright.com

                                            ***Counsel for National Vision, Inc.***

*/s/ Willem G. Schuurman (Lead Defendant)*

Willem G. Schuurman (TX Bar No. 17855200)
Avelyn M. Ross (TX Bar No. 24027871)
Ajeet P. Pai (TX Bar No. 24060376)
James D. Shead (TX Bar No. 24070609)
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Tel: (512) 542-8400
Fax: (512) 236-3218
bschuurman@velaw.com
aross@velaw.com
apai@velaw.com
jshead@velaw.com

**ATTORNEYS FOR DEFENDANTS
7-ELEVEN, INC., BARE ESCENTUALS, INC.,
BURBERRY LIMITED, CHRISTIAN DIOR
PERFUMES, LLC, CRABTREE & EVELYN,
LTD., DONNA KARAN INTERNATIONAL
INC., GOLD'S GYM INTERNATIONAL, INC.,
LVMH MOET HENNESSY LOUIS VUITTON,
INC., AND SEPHORA USA INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 11, 2012, all counsel of record who are deemed to have consented to electronic service are being served by electronic mail with a true and correct copy of the foregoing Defendants' Responsive Claim Construction Brief.


<u>*/s/ Mark T. Garrett*</u>
Mark T. Garrett